IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| v. | |
| RONALD MAYS | NO. 15-158-1 |

## MEMORANDUM

Baylson, J.                                                                                                                                                             May 27, 2016

At the sentencing of this defendant, who pled guilty to a so-called "reverse sting" narcotics charge, the Court upheld defense counsel's objection to the calculation of the offense level in the presentence report. In the parlance of law enforcement, a "reverse sting" occurs when an undercover police officer offers to supply drugs in return for cash, the target agrees, but an arrest is made when the target appears with the cash, and no transaction takes place. As an opera metaphor, picture Mimi, in Puccini's *La Boheme*, as a cop, knocking on Rodolfo's door to arrange a drug deal instead of just asking for a candle. Because of the unusual nature of the facts of this case and the possible novelty of the Court's ruling, this Memorandum will note the reasons for the Court's decision.

### I.   Summary of the Facts

The defendant was employed as a longshoreman and worked on the docks of various steamship companies for a number of years. He was contacted by a co-worker who, unbeknownst to defendant, was cooperating with the Department of Homeland Security. The informant and the defendant agreed that the defendant would assist in unloading certain items of cargo that contained cocaine. This occurred over a period of several weeks, in three separate batches.

The defendant was indicted under 21 U.S.C. § 841(a)(1),(b)(1)(C), for attempted possession of narcotics, which alleged that he "knowingly and intentionally attempted to possess

with intent to distribute a mixture and substance" of cocaine. The charge was only for "attempted" possession because, in fact, there was no cocaine in the bundles that defendant unloaded, although he was under the belief that the bundles contained cocaine. The defendant was paid a total of $12,000 for the first two unloading occasions, and after the third, received a payment of $12,500, which he then placed in a vehicle that he used to drive away. By prearrangement, a state police officer arrested the defendant and the money was seized. This seized money will be forfeited to the government, as it was advanced by Homeland Security.

The government's guilty plea memorandum (there was no plea agreement in this case) details the facts that the government gathered from the investigation. The government's narrative, which the defendant agreed was truthful at the guilty plea hearing, related in great detail the communications between the cooperating defendant ("CD") and the defendant leading up to the defendant's arrest. The Court does not question the validity of this prosecution and specifically finds that the defendant had sufficient *mens rea* to be charged with, and to support his guilty for, *attempted* possession.[1]

However, the government's memorandum does not contain information to support a finding that the defendant knew either the quantity of cocaine involved or what the value of the bundles he unloaded would have been if they had contained cocaine. There are no specific

---

[1] Although the Court does not question the validity of the prosecution, it does cite one additional piece of information that supports the court's view that defendant was not involved in drugs. Based on the defendant's sentencing memorandum, it appears Mr. Mays was interested in cooperating with the government, but the fact he was not known as a drug dealer prevented this:

> [Following his arrest, o]n more than one occasion [Mr. Mays] agreed to wear a wire and to meet with a target of the government's investigation, another dockworker. Unfortunately for the government and for Mr. Mays the target was extremely wary of Mr. Mays with whom the target had little prior relationship. The target did not engage in any conversation regarding the smuggling of cocaine. At the time of his attempts at cooperation Mr. Mays was still uncharged.

(ECF 28 at 2.)

2

references about the quantity of drugs in the guilty plea memorandum. The government does mention some numbers discussed between the CD and defendant, dated December 2, 2013, before any of the actual unloading took place, as follows:

> The CD said that the group wants to 'send over five'. . . . It's like ten grand coming your way ($10,000 to be paid to Mays). For a day's work, that ain't bad money.
>
> And Mays retorted, "That's not bad at all" and asked when they planned to do it.

The government asserts the number "five" is a reference to kilograms of cocaine, but there are no facts indicating that the defendant understood that the use of this number actually referred to kilograms of cocaine. The government's memorandum also mentions other instances in which the CD mentioned numbers to Mr. Mays.[2] The government, by the use of parentheticals, claims that these numbers refer to "kilograms of cocaine," but the record does not warrant the Court adopting that conclusion. There is no factual background that Mr. Mays himself was a drug dealer, that he was specifically told by the CD that the numbers the CD was mentioning referred to kilograms of cocaine, or that the defendant himself mentioned a number. Rather, the only indication that Mr. Mays had any knowledge of the drug industry appears in the probation officer's response to the defendant's objections to the presentence report. There, the probation officer mentions that Mr. Mays was targeted because the CD indicated that he and Mr. Mays "had worked for the same drug organization in the past." But that is the extent of the discussion of Mr. Mays' prior involvement with the drug trade.

The only discussion of money involved the amounts that were to be paid, or that actually were paid, to defendant Mays. The guilty plea memorandum notes that after the first delivery

---

[2] For example, the government quotes the following passages from recorded conversations between the CD and Mr. Mays, claiming that these passages are referring to cocaine quantity: "like five, six, seven, around that ballpark," "the store opens at 7," "needed six of them," and "three and three." (ECF 28.)

"the CD gave Mays $6,000 in cash." There is no indication that this amount was negotiated between the CD and the defendant or that the defendant was ever told that this had any relationship to what the value of the cargo would have been if the cargo had contained cocaine. There is no dispute that Mr. Mays was paid $6,000 in cash after the second delivery, and $12,500 after the third delivery.

## II. Application Notes

The Application Notes to the Sentencing Guidelines play a critical role in determining the sentence in this case. These Application Notes are binding in most circumstances. *Stinson v. United States*, 508 U.S. 36, 43 (1993).[3] Commentary, which includes the Application Notes,[4] should "be treated as an agency's interpretation of its own legislative rule." *Id.* at 44. Thus, "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id.* at 38. "Failure to follow such commentary could constitute an incorrect application of the guidelines, subjecting the sentence to reversal on appeal." U.S.S.G. § 1B1.7.

The presentence report aligned with the government's position because both relied on U.S.S.G. § 2D1.1, Application Note 5, which indicates:

a) Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the Court shall approximate the quantity of controlled substance.

---

[3] Although *Stinson* pre-dated *Booker*, *Booker* appears to have had no impact on *Stinson*'s holding about the binding nature of the commentary. *United States v. Kluger*, 722 F.3d 549, 556 n.10 (3d Cir. 2013) ("In *Stinson v. United States* the Supreme Court explained that the commentary not only clarifies the guidelines but also 'provides concrete guidance as to how even unambiguous guidelines are to be applied in practice.' Though the guidelines are no longer mandatory, we still look to the commentary when we calculate the guideline sentence as we would have pre-*Booker*." (internal citations omitted)).

[4] *See United States v. Kluger*, 722 F.3d 549, 556 n.10 (3d Cir. 2013) ("[T]he commentary's application note 2 reads . . . .").

      b)     In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level . . .

      c)     . . . in a reverse sting, the agreed-upon quantity of controlled substance would more accurately reflect the scale of the offense because the amount delivered is controlled by the government and not the defendant.

The presentence report calculated the defendant's offense level at thirty (30), accepting that Mr. Mays's conviction involved twelve (12) kilograms of cocaine based on the government's representation that the numbers mentioned by the CD to the defendant were representative of kilograms of cocaine.

### III. Contentions

Defense counsel objected to the probation office's calculation as improper because there was no "agreed-upon" quantity, and thus, Application Note 5's reference to the "agreed-upon quantity" was inapplicable. The CD merely mentioned numbers rather than actual amounts of cocaine, and the defendant had no basis to know what the quantity or value was. Furthermore, defense counsel argued that, in this "reverse sting" type of prosecution, there should be no quantity attached to the unloading because there was, in fact, no cocaine in the shipment. *See* U.S.S.G. § 2D1.1(c). Thus, defense counsel argued that the offense level should be twelve (12), because that is the lowest computation for the offense to which defendant pled guilty, under Guideline § 2D1.1, as set forth in § 2D1.1(c)(14). Level 12 is for a mixture or substance containing a detectable amount of cocaine that is less than 50 grams.

The base offense levels suggested by the government and the defense, therefore, have a very high variation of eighteen (18) levels. The Guideline range under the government's theory, which was adopted by the presentence report, was 57-71 months. But the Guideline range for the calculation using the defendant's suggested offense level of 12, after other deductions, was Level 8, or 0-6 months.

From the bench, the Court agreed with the defendant's argument that the base offense level should be Level 12, and accordingly, sentenced him to six months imprisonment.

## IV. Determining the Drug Quantity

At sentencing, the government must prove the quantity of the controlled substance by a preponderance of the evidence. *United States v. Raven*, 39 F.3d 428, 434 (3d Cir. 1994); *United States v. Reyes*, 930 F.2d 310, 315 (3d Cir. 1991). Once Mr. Mays submitted objections to the presentence report, the government was on notice that satisfying its burden may require more specific evidence than it had stated in the guilty plea memo or the presentence report, but it did not do so.

### A. "Agreed-Upon Quantity"

Application Note $5^5$ to U.S.S.G. § 2D1.1 calls for a sentencing judge to "approximate" the amount of controlled substance. Specifically, the Application Note indicates that the appropriate amount in reverse-sting cases will be the "agreed-upon quantity."

Because of the guidance in Application Note 5, the calculation of the amount of controlled substances in a reverse-sting scenario is typically a straight-forward task because the defendant usually explicitly agrees to an amount to be bought, sold, or transferred. But, in what appears to be a novel factual situation in this circuit, the government has failed to show that there was an agreed-upon amount.

To support its articulation of the amount of cocaine involved, the government quotes the discussions between the CD and Mr. Mays. But these quotes are of coded discussions and do not contain any explicit references to drug amounts. According to the government, the CD was speaking with the defendant in code to appear to avoid detection by law enforcement.

---

[5] This appears to have previously been Application Note 12. *See United States v. Smack*, 347 F.3d 533, 538 (3d Cir. 2003) (quoting the language of the current Note 5 and attributing it to Note 12).

The only other evidence that might support that there was an agreed-upon amount, or even that Mr. Mays was aware of how much cocaine he was handling, came from a conversation between the CD and Mr. Mays following the last pick-up. Mr. Mays had picked up two separate boxes that he believed contained cocaine. According to the government: "[Mr. Mays] pointed out that one of the boxes was bigger than the other, noting that there were four in one of the boxes. The CD corrected Mays and told him there were three in each box. Surprised, Mays responded, '[t]hat's gotta be small a** bricks.'" (ECF 28 at 7.) This evidence is too vague to persuade the Court that there was an agreed-upon quantity between Mr. Mays and the CD.

As a result, the Court finds that Application Note 5's guidance regarding "reverse stings" is inapplicable to the facts here. The Court believes that Application Note 5's "reverse sting" instruction was directed towards a person who is a drug dealer and would have some understanding of the drug business so that they would realize the seriousness of the crime that they were committing. To be sure, it can be characterized that the act of unloading cocaine from a ship is an important link in the chain of custody from the origin of drugs to their being distributed by drug dealers, but that situation is not this case. Without any evidence from the government that this defendant was accustomed to dealing in drugs, or was part of a conspiracy to distribute drugs, the Application Note does not apply to this type of evidence.

### B. Quantity Calculation Absent an Agreed-Upon Quantity

Given the lack of an agreed-upon amount, the Court is left to approximate the amount of the controlled substance using other methods and factors. *See* U.S.S.G. § 2D1.1 App. Note 5; *United States v. Clark*, 419 F. App'x 248, 250-51 (3d Cir. 2011) (unpublished) (reciting, in a case involving a reverse sting, that "[w]here there is no drug seizure, the sentencing judge is to approximate the quantity of the controlled substance," but applying the "agreed-upon quantity" rule). In doing so, the Court is aware that some courts have expressed concern about the

government's unilateral control over the amount of the controlled substances in the absence of an agreed-upon amount. *United States v. Solomon*, 766 F.3d 360, 366 (3d Cir. 2014). The Court is also guided by the rule of lenity. *See United States v. Flemming*, 617 F.3d 252 (3d Cir. 2010) ("[The rule of lenity] applies to the Sentencing Guidelines.").

There are no facts on which this Court, in good conscience, could rely to conclude that Mr. Mays trafficked any quantity at all. There was no actual possession of drugs, which is why the defendant pleaded guilty to an offense of "attempted possession." There are no facts indicating that the defendant agreed to any amount or value of cocaine. And, the government has not presented any evidence indicating that Mr. Mays was aware of the government's purported quantity.[6] Thus, the Court cannot rely on the amount of actual cocaine unloaded, an agreed-upon amount, or evidence indicating what quantity Mr. Mays believed he was unloading.

Furthermore, it would be very unfair, in this Court's opinion, to adopt a Sentencing Guideline Offense Level commensurate with the value or the quantity of fake drugs in this case. Mr. Mays was being paid only for unloading. As such, unlike a buyer or seller, he would not have a clear picture of the amount involved in the transaction as he never needed to lay eyes on the "drugs." There is no evidence that the amount that he was paid for the unloading the boxes had any relationship to the quantity of drugs, much less that he knew of any relationship between the amount he was unloading and the payment he was receiving. It is also reasonable to believe that the defendant thought that the cocaine was hidden within the boxes he was unloading, and therefore the size of the boxes fails to provide a basis on which to estimate the value of the cocaine.

---

[6] The government might have shown, for example, that the defendant had a long history in the drug trade such that he would have known how much cocaine he would have to unload to earn $6,000 for unloading it. But it did not.

In light of the foregoing, the Application Notes fail to provide a mechanism by which this Court could determine the amount of cocaine involved. When "there is a *grievous* ambiguity or uncertainty in the statute," the rule of lenity is triggered. *United States v. Flemming*, 617 F.3d 252, 270 (3d Cir. 2010). This rule requires that such uncertainties be resolved in favor of criminal defendants when the "ambiguity in the criminal statute cannot be clarified by either its legislative history or inferences drawn from the overall statutory scheme." *Id.* at 269.

This case triggers the rule of lenity only because the government has failed to present facts that would allow the Court to fairly calculate the amount of the controlled substance. That failure has revealed a gap in the Application Notes, which are binding when applicable. *Stinson v. United States*, 508 U.S. 36, 43 (1993). On the one hand, according to the Application Notes, the Court is required to approximate the quantity. On the other, the Court's approximate quantity should have some basis in reality, and the government has failed to show any evidence that would permit the Court to find any quantity of drugs. Thus, this Court is left with a unique situation in which the statutory requirements for attempted possession are present, but there is no evidence on which this Court could base a good faith estimate of the quantity involved. In light of this uncertainty, the Court believes that the only way it can balance its statutory duties with the defendant's entitlement to due process is to find that the quantity in this case is zero (0) grams.

For all these reasons, this Court believes that there is no basis upon which the Court could approximate the quantity of the controlled substance. Because the government has failed

to meet its burden of proof, and considering the rule of lenity, the Court finds that the quantity of cocaine in this case is zero (0) grams.

## V. Conclusion

From the bench, this Court held that the defendant's base offense level should be reduced to Level 12. Therefore, the Court sentenced the defendant to a six-month sentence, within the 0-6 month Guideline range.

The Court recognizes that it could have adopted the presentence report and then readily given the defendant a "downward variance" from the Guideline range. That would not have captured what the Court feels is a measure of "sentencing overreach" in a very unusual factual situation. Given the relatively minor nature of this offense, compared to the serious trafficking in drugs by dedicated and committed drug gangs, the Court must wonder why the Department of Homeland Security was fronting over $24,000 of public funds to capture Mr. Mays, surely a minor player by any standard. The Court decided to prepare this memorandum in case the government appeals or for the Sentencing Commission to consider whether to revise the Guidelines to cover this unique factual situation.

The defendant was also sentenced to pay restitution of $12,000.00, which is the amount he had been paid after the first two unloading events.

The Court notes that, given defendant's financial status, and the fact that he has substantial funds in a retirement account, defendant is required to show cause why he should not reimburse the Defender Association for the value of services, consistent with *United States v. Konrad*, 730 F.3d 343 (2013).

BY THE COURT:

MICHAEL M. BAYLSON, U.S.D.J.